1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

10   DANITA ERICKSON,

NO.  2:18-cv-01029-JCC

11                          Plaintiff,

PLAINTIFF'S OPPOSITION TO
DEFENDANT'S

12   vs

MOTION FOR SUMMARY JUDGMENT

BIOGEN, INC.

13

NOTED FOR: AUGUST 30, 2019

14                          Defendant.

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S OPP TO DEF SJ MOTION - 1
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

## I.    INTRODUCTION

Danita Erickson sued Biogen, Inc., for discrimination, retaliation, and wrongful termination in violation of the Americans with Disabilities Act, Title VII, the Age Discrimination in Employment Act, the Washington Law Against Discrimination, the False Claims Act, and public policy. While Biogen moves to dismiss Plaintiff's case, this Court should deny the motion because there are material issues of fact related to all claims, including regarding Erickson's disability, her manager's preferential treatment of men over women, false claims made to Medicare, and Erickson's protected activity under the ADA, WLAD, and the FCA.

## II.    STATEMENT OF FACTS

Biogen is a global pharmaceutical company focusing Multiple Sclerosis. Ex. 1 (Palacio Dep.) at 24:18-26:24.[1] Biogen separates its sales force from the medical/research side and requires the two groups to maintain independent roles. *Id*. at 76:25-77:12. In the sales division, field employees, who sell the MS portfolio to medical providers, are called Territory Business Managers (TBMs) and are characterized as Executive, Senior, or regular, with Executive and Senior being more experienced. Ex. 2 (Brown 30(b)(6) Dep.) at 45:24-47:21.

Biogen instructs TBMs that they must adhere strictly with false claims statutes. Ex. 3 at 804; Ex. 4 (Erickson Dep.) at 168:8-22. For instance, both Washington and federal law prohibit participating in presenting fraudulent insurance claims. *See* RCW 74.66.020(1); 31 U.S.C. § 3729(a)(1)(A)-(B).   TBMs cannot participate in promotion of off-label use of any Biogen products and must "take special care to avoid even the appearance of unduly influencing" clinical decisions, promoting Biogen products only "for the uses that have been approved" by the FDA. Ex. 3 at 810. TBMs are required to follow theses policies and report

---

[1] All exhibits cited herein correspond to the Declaration of Janelle E. Chase Fazio in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

1    potential issues, such as the off-label use or promotion of a drug. Palacio Dep. at 79:25-
2    81:25; Ex. 3 at 803. TBMs are instructed: "continue to raise your concern until it has been
3
   addressed. . . you should consider contacting your manager's manager, another manager, the
4
   Compliance Helpline, or one of the other resources listed in the Code." *Id*.
5
6         TBMs are formally reviewed every six months. Brown 30(b)(6) Dep. at 47:24-48:4.
   TBMs receive an "OPR rating," which is a two-part numerical score. *Id*. at 44:7-14; 50:5-14;
7
8    65:6-8. The first number is based on the TBM's objective sales data and the second number
9    is based on the regional manager's subjective assessment. *Id*. at 54:20-55:5. Four subjective
10    sales competencies are evaluated: territory and account planning, business knowledge, sales
11    disposition, and customer-focused selling. *Id*. at 50:25-51:10. In performance reviews TBMs
12    are competitively rated "*as compared to other employees in their peer groups*." Ex. 5 at 1255
13    (emphasis in original). Biogen provides guidelines to instruct managers how to rate TBMs.
14
   Brown 30(b)(6) Dep. at 51:11-18; Ex. 5 at 1255; Ex. 6 at 1486. "Stakeholder feedback," also
15
16    known as the "key to a fair review," is feedback from peers and/or customers. Ex. 5 at 1257.[2]

17        Danita Erickson is a 47-year-old woman with over 20 years of experience in the
18    medical sales industry. Erickson Decl. at ¶ 2. Erickson was hired at Biogen in 2011 as a
19    Senior TBM. *Id*. at ¶ 3. Erickson worked in a Western Washington territory, which included
20    some customers in Seattle and the Tacoma South Sound, as well as parts of Alaska. *Id*.
21
   Erickson shared this territory with sales partner Jim Lykins. *Id*. In late 2017, Erickson and
22
23    Lykins' Western Washington counterparts were Sarah Lenoue and Matt Chapman, whose
24    territory was the Seattle area. *Id*. at ¶ 4. Lenoue and Erickson were hired together in 2011. *Id*.

25
26

---

[2] Brown never sought stakeholder feedback regarding Erickson. Brown 30(b)(6) Dep. at 57:25-58:2. But Erickson's peers considered her to be professional, confident, customer-focused, highly respected amongst medical providers, and thought she had "all the qualities that you want in a co-worker or someone that works for your company." Lenoue Dep. at 104:23-105:23; 164:9-16; Volkmann Dep. at 48:22-49:13.

PLAINTIFF'S OPP TO DEF SJ MOTION - 3
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

1   Chapman was hired in 2017 as a regular TBM. *Id*. In late 2017, early 2018, Erickson's

2   manager was regional manager Mary Brown. *Id*.

3       Erickson had positive reviews, including the final two leading up to her termination,

4   receiving OPR ratings of 2/2, signifying she met sales expectations and was proficient in all

5   four sales competencies. Brown 30(b)(6) Dep. at 42:8-43:19; 57:5-13; *see also* Exs. 7-9

6   (Reviews and Sales). Brown never gave Erickson a negative review. Brown 30(b)(6) Dep. at

7   61:1-10. Brown's reviews of Erickson were uniformly positive. Ex. 8 at 1942-43.

8

9       Erickson has experienced migraines for the last ten years that cause sharp, stabbing

10  pain in her eyes and pounding pain in her head and neck, and which on a pain scale of 1 to

11  10 often are at a level of 8. Galvon Decl. at ¶¶ 3-4. These migraines are severely debilitating.

12  Galvon Decl. at ¶ 4. Sometimes one migraine lasts two days and sometimes she has six to

13  eight migraines in a month. *Id*. at ¶ 5. Her migraines are triggered by many things, including

14  stress and external factors. *Id*. When she is particularly stressed, Erickson's migraines

15  increase in frequency. Erickson Decl. at ¶ 5. Air travel is not a particular trigger for her

16  migraines and her physician has not recommended she avoid air travel. Galvon Decl. at ¶ 5.

17

18       In September 2017, Erickson suffered a debilitating migraine on a sales trip with

19  Brown. Erickson Decl. at ¶ 6. Brown seemed understanding at the time, but shortly thereafter

20  began questioning Erickson about her migraines. *Id*. at ¶ 7. Brown inquired about Erickson's

21  migraines on several occasions, referencing the September incident or asking for more details

22  about the severity of frequency of her migraines. *Id*. Brown expressed concern about

23  Erickson's ability to do her job. *Id*. Brown recommended Erickson seek other employment. *Id*.

24  Brown also discussed Erickson's condition with her colleagues without Erickson's permission,

25

26

PLAINTIFF'S OPP TO DEF SJ MOTION - 4
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

including asking Lykins about his observations of the frequency and severity of Erickson's migraines, and discussing the migraines with Lenoue. *Id*; Ex. 10 (Lenoue Dep.) at 52:17-55:8.

During the time Brown was her manager, Erickson noticed Brown favored male TBMs over females. Erickson Decl. at ¶ 8. Brown disproportionately called on male TBMs during meetings to report results in their territories, assigned male TBMs to committees that gave them exposure in the industry, supported male TBMs with promotions in the company, and assigned male TBMs more advanced tasks like taking the new Division Manager on a day of field calls. *Id*. By contrast, Brown regularly disregarded comments made by female TBMs at meetings, overlooked female TBMs for committee assignments, refused to participate in promotions female TBMs sought in the company, and assigned female TBMs to more administrative tasks, such as finding a dinner location. *Id*. Erickson's coworkers noticed the same issues. Lenoue noticed Brown favored men when deciding opportunities at the regional level. Lenoue Dep. at 42:19-43:23 ("everybody else should have an opportunity as well, and it seemed like they were mostly going to either one person or the males in the group."). Brown spent more time and energy helping male TBMs apply for promotions within the company, including helping them prepare for interviews. *Id*. at 45:8-20.

Shane Volkmann reported Brown's favorable treatment of men over women during a meeting with Division Manager Zac Allison in November 2017. Ex. 11 (Volkmann Dep.) at 55:5-56:1. Volkmann reported that Brown should "treat[] her female workers a little better, or equally" to the male TBMs. *Id*. at 33:20-34:2. Allison claimed Volkmann's report was based on Erickson's observations. Ex. 12 (Allison Dep.) at 51:7-17. Erickson and Volkmann had discussed the issue, and another female colleague, Amo Cummings, told Volkmann she also

PLAINTIFF'S OPP TO DEF SJ MOTION - 5
[2:18-cv-01029-JCC]
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

reported Brown. Volkmann Dep. at 72:18-73:10. In fact, Volkmann's report was based on his own observations. *Id*. at 55:24-56:1. No one followed up with Volkmann. *Id*. at 107:11-20.

As of fall 2017, Zinbryta was a drug in the Biogen portfolio. Ex. 13 (Brown Dep.) at 78:13-17. Zinbryta was FDA approved to treat MS. *Id*. at 76:20-77:4. It was hard to sell because of its safety profile; patients had to fail on other drugs before they could use Zinbryta. Volkmann Dep. at 38:4-9.[3] TBMs had a quarterly Zinbryta quota of one per territory and triggered the commission for a sale by having a provider submit a Biogen START form. Brown Dep. at 78:4-79:7. Critically, the START form is pre-filled with the International Classification of Disease (ICD) codes for MS, and by signing the START form the provider "certifies that the rationale for prescribing ZINBRYTA therapy is for a primary diagnosis of ICD-9:340/ICD-9:340/ICD-10:G35."[4] Ex. 14 (Zinbryta START form). The START form references MS throughout and does not encompass any other use. *Id*.

In September 2017, Lykins became involved in the prescription of Zinbryta for off-label use to a patient with aplastic anemia. Erickson Decl. at ¶ 9. On September 15, 2017, a Biogen case manager questioned whether it was appropriate to participate in the prescription since the drug would not be used for MS. Ex. 15 at 167-8. This was a Medicare patient. Erickson Decl. at ¶ 9. Erickson was concerned Lykins and the provider were discussing Medicare fraud because the pre-filled Zinbryta START form would falsely represent that the prescription was for on-label use to treat MS when it was really for off-label use. *Id*.

Erickson objected directly to Lykins about the potential false claim to Medicare. When Lykins continued with his involvement in the fraudulent prescription, Erickson

---

[3] Zinbryta was pulled from the U.S. market in March 2018 for safety issues. Brown Dep. at 78:21-23.

[4] These are both MS Codes, one in use before October 2015, the other in use after that date. *See* https://icd.codes/icd9cm/340 (IDC9 used until October 2015, then ICD-10 code used); *see also* https://www.cms.gov/Medicare/Coding/ICD10/index.html.

PLAINTIFF'S OPP TO DEF SJ MOTION - 6
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

expressed her concerns to Brown. Erickson Dep. at 276:6-277:1; Brown Dep. at 90:1-17; 100:6-10 ("Q So you were aware that Ms. Erickson had concerns about the Tacoma off-label Zinbryta patient, correct? A I was aware that she had talked to me about it a bit."). Brown did not stop Lykins' participation in the fraudulent prescription. *Id*. at 101:4-15.

In November 2017, Allison visited Seattle to meet Brown's sales team. Allison Dep. at 64:22-65:8. In this visit, Brown selected Lykins to spend significant time with Allison. Ex. 16. During that visit, Allison interacted with Erickson on a limited basis during two introductory meetings. Erickson Decl. at ¶ 11. In the first meeting, Lykins and Allison sat in chairs in front of the doctor and Erickson sat behind them. Allison Dep. at 66:22-68:17. This meeting lasted less than an hour and Lykins and Allison did most of the talking. *Id*. The second meeting was 10 to 15 minutes with a VA doctor, in which no sales were discussed. Erickson Decl. at ¶ 11. At no time did Allison observe Erickson in her sales capacity. *Id*.  Erickson opposed the Zinbryta sale to Allison at dinner that evening. Erickson Decl. at ¶ 12. On December 1, 2017, Biogen's CEO sent an email about obligations to report. Ex. 17. On December 4, 2017, Brown sent an email congratulating Erickson's territory for meeting their Zinbryta goal. Ex. 18 at 185-6. The only Zinbryta sale was the off-label sale. Erickson Decl. at ¶ 13. Erickson believed Brown's email confirmed the hematologist in Olympia submitted the Zinbryta START form, misrepresenting to Medicare that the prescription was for MS instead of aplastic anemia. *Id*.

After Lykins, Brown, and Allison disregarded Erickson's verbal reports, and believing that Brown's email confirmed Medicare fraud had occurred, Erickson reported the issue to the ethics hotline on December 6, 2017. Dkt. 49 at 95. The report noted "Danita confronted Mary [Brown] and is currently in fear of retaliation." *Id*. Erickson followed up by speaking to Biogen's in-house counsel Dan Curto in December 2017. Erickson Decl. at ¶ 14.  Curto called Brown in

PLAINTIFF'S OPP TO DEF SJ MOTION - 7
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

December 2017 as part of his investigation into Erickson's reports. 30(b)(6) Brown Dep. at 76:23-77:3. Notably, after speaking with Curto, Brown had to take action so her region would not receive a commission on the off-label sale reported by Erickson. Brown Dep. at 90:1-92:7.

Biogen was compelled to produce the patient file for the Zinbryta prescription at issue. Dkt. 40 at 8. The patient file shows the form was submitted by the doctor using the MS diagnosis code. Ex. 19 at 1731. It also confirms this patient's primary medical insurance was Medicare. *Id*. at BGN001733. There is a letter from Humana from an appeal of denied Zinbryta coverage that does not discuss any approval for an <u>off-label</u> use of the drug. *Id*. at 1727. Instead, the letter explains Zinbryta is not on Humana's approved drug list, but that an exception would be made to cover payment. *Id*. Nowhere in the patient file does it explain this is an off-label use of Zinbryta for aplastic anemia. *Id*.

In January 2018, about a month after Erickson filed her report and Curto launched his investigation, Erickson spoke to HR manager Keri Palacio about Brown's repeated commentary regarding her migraines, as well as Brown's preferential treatment of male TBMs and retaliation concerns. Erickson Decl. at ¶ 15; Palacio Dep. at 158:5-10. Erickson was the second Biogen employee to report this concern. Palacio Dep. at 47:1-11; 173:17-25.

Contrary to company policy, Palacio did not investigate the allegations because she and Allison "did not feel that the statement was justified." *Id*. at 47:12-48:13; *see also* Ex. 20. Palacio determined after speaking to Biogen in house counsel Curto that Erickson's (and Volkmann's) reports regarding Brown were not reports of discrimination. *Id*. at 46:22-47:24; 70:19-71:25. Yet, Brown was verbally counseled by Allison regarding Erickson's report during her 2017 year-end review. Allison Dep. at 183:1-184:15; Palacio Dep. at 69:1-22.

PLAINTIFF'S OPP TO DEF SJ MOTION - 8
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

By late January 2018, Brown and Allison identified Erickson for realignment, *i.e.* termination, and placed her on a list of "bottom performers" presented publicly at a division meeting. 30(b)(6) Brown Dep. at 21:5-24:5; Ex. 21. This behind-the-scenes decision was made a month before Biogen directed Brown to evaluate TBMs in her territories for the RIF and before Brown was aware of the RIF criteria.[5] *Id*. at 13:1-14:2. Allison ratified the decision to terminate Erickson; though he had spent limited time with her, he claimed she was the weakest in customer focused selling. *Id*. at 29:22-31:8; *see also* Ex. 22. On January 19, 2018, Brown sent Allison a text describing a concern and desire not to "expose" herself, in reference to the decision to terminate Erickson. *Id*. at 79:17-81:12.

A month later, in mid-February 2018,[6] Palacio sent the RIF criteria to managers: The first step was to compare territory TBMs' OPR ratings from performance reviews, the second step was to subjectively rate the TBMs in three sales competencies, and the third step was based on tenure with the company. 30(b)(6) Brown Dep. at 90:8-91:1. Biogen did not consider sales performance in the 2018 RIF aside from the OPR rating. *Id*. at 29:6-10. On the first step, Erickson and her peers had all received the same OPR rating of 2/2. *Id*. at 25:11-18.

For the second step, Brown was given the role of subjectively ranking Erickson, Lykins, Lenoue, and Chapman. Brown 30(b)(6) Dep. at 29:17-21; 93:23-94:2; Palacio Dep. at 136:12-16. Brown rated Erickson as "developing" for customer focused selling, giving her the lowest overall score of the four TBMs. Brown 30(b)(6) Dep. at 96:15-18; 99:17-100:2. Brown rated Chapman "proficient" in all areas, although she testified she "probably" rated him

---

[5] Incidentally, this decision also came <u>before</u> Erickson received her 2017 year-end performance review, in which she was given a solid 2/2 rating as compared with the rest of her peers. 30(b)(6) Brown Dep. at 57:5-24. Her 2017 end of year review did not indicate any problems with performance, although she had already been selected for termination and was allegedly "developing" in customer focused selling. *Id*.

[6] In the meantime, after she had identified Erickson for termination in mid-January, Brown performed Erickson's final 2017 review in early February, in which she rated Erickson as proficient in all the subjective competencies. 30(b)(6) Brown Dep. at 75:1-76:22; Brown Dep. at 110:9-21.

PLAINTIFF'S OPP TO DEF SJ MOTION - 9
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

"developing" during ride alongs in 2017. *Id*. at 66:25-67:4.[7] Brown did not review any performance reviews, field ride along reports, sales data, or any other objective documentation in deciding to terminate Erickson. *Id*. at 28:2-8.

The third step was tenure. *Id*. at 90:8-91:1. In previous RIFs, tenure was considered <u>before</u> the subjective criteria. Volkmann Dep. at 47:6-48:9.[8] Had Biogen followed the same criteria as former RIFs, Chapman would have been selected as he had the least tenure. *Id*. In reality, Brown and Allison had already made the decision to select Erickson for termination a month before receiving the criteria.  30(b)(6) Brown Dep. at 13:1-14:2; 21:5-24:5.

Not knowing she had already been identified for termination, Erickson repeated her concerns about Brown to Palacio in February 2018. Erickson Decl. at ¶ 16. Meanwhile, Palacio ratified the decision to terminate Erickson, despite her knowledge of Erickson's reports of gender discrimination and FCA reporting and knew of Erickson's fear of retaliation. Palacio Dep. at 143:14-148:8. Palacio was concerned that the only two TBMs Brown chose for termination from her territories were women, but the only action she took to ensure it was a fair decision was to discuss it with Brown and Allison. *Id*. at 49:24-50:10; 172:18-173:4.

After Erickson was terminated, Chapman, a male TBM with only one year at Biogen, was moved to Erickson's former territory with Lykins. Brown Dep. at 184:3-15. Chapman is not-disabled and has never reported a potential false claims issue. *Id*. at 184:22-185:3. After Erickson was terminated, Brown told the TBMs that the RIF decision "had all been determined by the HR department." Lenoue Dep. at 111:1-10.

---

[7] Brown never rated Erickson's as "developing" in any aspect of her 2017 ride alongs.

[8] Biogen objected to Plaintiff's Discovery of information on prior RIFS and with the Court's ruling on the parties' LCR 37 motion the 30(b)(6) depositions on this topic are scheduled for early September 2019.

PLAINTIFF'S OPP TO DEF SJ MOTION - 10
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

### III.   ANALYSIS

The Ninth Circuit "has set a high standard for the granting of summary judgment in employment discrimination cases." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996).   "We require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry-one that is most appropriately conducted by the factfinder, upon a full record." *Id*. (internal quotations and citations omitted).   Washington law is in accord. *Scrivener v. Clark Coll*., 181 Wn.2d 439, 445, 334 P.3d 541 (2014).

A plaintiff may defeat summary judgment by offering direct or circumstantial evidence "that a discriminatory reason more likely motivated the employer," or "that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Anthoine v. North Central Counties Consortium,* 605 F.3d 740, 753 (9th Cir. 2010). Direct evidence includes "clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co.,* 413 F.3d 1090, 1095 (9th Cir. 2005). Only a small amount of direct evidence creates an issue of material fact as to pretext. *Id.* Circumstantial evidence that tends "to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1222 (9th Cir.1998); *Alonso v. Qwest Commc'ns Co., LLC*, 178 Wn. App. 734, 743, 315 P.3d 610, 616 (2013).  When it is alleged that a RIF was discriminatory, "the plaintiff may establish her prima facie case by demonstrating: (1) that she belongs to a protected class; (2) that she was discharged from a job for which she was qualified; and (3) that others not in her protected class were treated more favorably." *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1993).

PLAINTIFF'S OPP TO DEF SJ MOTION - 11
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

The evidence outlined above, supports a case of retaliation in violation of state and federal law, as well as discrimination based on disability and gender.[9] Erickson was subjected to the adverse employment action of termination. The only factual issue is whether her selection was for legitimate reasons as Biogen claims, or whether illegal retaliation or discrimination were factors – a question the factfinder must determine at trial.

A.     Biogen Retaliated Against Erickson In Violation of WLAD and ADA

"To establish a *prima facie* case of retaliation under the ADA or WLAD, a plaintiff must show (1) that he or she engaged in or was engaging in activity protected by the ADA or WLAD, (2) the employer subjected him or her to an adverse employment decision, and (3) that there was a causal link between the protected activity and the employer's action." *Steenmeyer v. Boeing Co.*, 92 F. Supp. 3d 1024, 1031 (W.D. Wash. 2015). On the third element, "if the employee establishes that he or she participated in an opposition activity, the employer knew of the opposition activity, and he or she was discharged, then a rebuttable presumption is created in favor of the employee that precludes us from dismissing the employee's case." *Kahn v. Salerno*, 90 Wn. App. 110, 131, 951 P.2d 321 (1998).  Federal law applies a "but for" causation standard for retaliation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, __ U.S. __, 133 S.Ct. 2517, 2533 (2013). However, under the WLAD, a "substantial factor" standard applies. *Allison v. City of Seattle*, 118 Wn.2d 79, 89 n.3, 96 (1991).  Also, unlike claims for discrimination, there is no need to prove that a plaintiff was actually disabled in order to pursue a cause of action for retaliation. *Shellenberger v. Summit Bancorp, Inc*., 318 F.3d 183, 188 (3d Cir. 2003) (". . . we note that Shellenberger's failure to establish that she was disabled does not prevent her from recovering if she can establish that her employer terminated her because she engaged in activity protected under the ADA.").

---

[9] Erickson pleaded a claim for age discrimination, but she withdraws this claim at this time.

PLAINTIFF'S OPP TO DEF SJ MOTION - 12
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

Here, Erickson engaged in activity protected under the WLAD and ADA by reporting Brown's commentary regarding her inability to do her job and suggesting that she seek alternate employment because of her migraines, and also reporting Brown's favorable treatment of male TBMs. Erickson Decl. at ¶ 15; Palacio Dep. at 158:5-10. Erickson first reported these concerns to Palacio in January 2018 and was identified for termination that same month. 30(b)(6) Brown Dep. at 21:5-24:5; Ex. 21. There is sufficient evidence of causation because Biogen knew of Erickson's reports and actions when it decided to terminate her employment.  All three employees involved in the termination decision (Brown, Allison, and Palacio) were aware of Erickson's reports of false claims concerns, and disability/gender discrimination concerns: Allison counseled Brown regarding Erickson's reports of her disparate treatment of male over female TBMs. Brown directly raised the false claims concerns with Brown and Allison and raised all her concerns with Palacio and Curto. Brown Dep. at 90:1-17; 100:6-10; Allison Dep. at 183:1-184:15; Palacio Dep. at 69:1-22.

B.     **Biogen's Claimed Reason For Erickson's Termination Is Pretext**

Using the circumstantial evidence test, the burden now shifts to Biogen to produce evidence of a legitimate non-discriminatory, non-retaliatory reason for Erickson's termination. *Boyd v. State, Dep't of Soc. & Health Servs.*, 187 Wn. App. 1, 12 (2015). The requirement is not a given. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008) (holding "To meet its burden, the employer must explain why it selected the plaintiff in particular for the layoff."). Critically, any purported legitimate reason must be the reason *actually* relied upon by the decisionmaker, not merely a *post-facto* reason articulated by counsel with the benefit of hindsight, a developed record, and knowledge of the law. *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 404 (1st Cir. 1990) ("a defendant may not invent a post hoc rationalization for its actions at the rebuttal stage of the case.") (collecting cases).

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

Rather, the employer must "point to specific facts" the decisionmaker "had at the time the decision was made that would justify its belief in the proffered reason." *Brooks v. Davey Tree Expert Co.*, 478 F. App'x 934, 943 (6th Cir. 2012). *See also*; *E.E.O.C. v. Alton Packaging Corp*., 901 F.2d 920, 925 (11th Cir. 1990) (the "reason must include the fact that the decision-maker knew that [reason].").  The Washington Supreme Court clarified: "An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer." *Scrivener*, 181 Wn.2d at 446-47. An "employee is not required to produce evidence beyond that offered to establish the prima facie case." *Rice v. Offshore Sys., Inc.*, 167 Wn. App. 77, 89, 272 P.3d 865, 872 (2012). A plaintiff must "demonstrate a triable question of fact as to whether the explanations put forward by the [employer] are mere pretexts for retaliatory animus." *Kerr v. Jewell*, 549 F. Appx/ 635, 639 (9th Cir. 2013). But the Ninth Circuit has "repeatedly cautioned . . . that a plaintiff's burden to raise a triable issue of pretext is hardly an onerous one." *Id*. (internal quotations omitted).  Moreover, "[c]ircumstantial evidence of pretext must be considered cumulatively" and "a court must not ignore a plaintiff's prima facie evidentiary showing at the pretext stage of the *McDonnell Douglas* analysis."  *Cortes v. Cty. of Santa Clara*, No. 13-16996, 2016 WL 240624, at *1 (9th Cir. 2016).  While Biogen claims Erickson was terminated because she was the weakest among her peers this is unpersuasive for many reasons as discussed below.

### 1.  Biogen's Claims About Erickson's Performance Are Untrue

Biogen's inconsistencies about subjective performance is evidence of pretext. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (trier of fact may "infer the ultimate fact of discrimination from the falsity of the employer's explanation"); *Hill v.*

PLAINTIFF'S OPP TO DEF SJ MOTION - 14
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

*BCTI Income Fund-I*, 144 Wn.2d 172, 185, 23 P.3d 440 (2001) (same; quoting and adopting *Reeves*).  Here, Erickson had a 2/2 OPR rating in her final reviews before termination, which is defined as meeting Biogen's "high expectations for delivering results," meeting or exceeding "high expectations for most goals," and consistently meeting the "high expectations" of the core behaviors of the position. Ex. 5 at 1264. In Erickson's final review, Brown noted Erickson's "solid command of [her] business with strong territory and account planning, analysis, management and collaboration" in her TBM role. Ex. 8 at 1943. However, Erickson was already identified for termination before receiving that final 2/2 rating and the false claim later given to justify the termination was that she was incapable of selling the Biogen portfolio in a confident manner. Allison Dep. at 162:12-163:11; Brown Dep. at 159:5-11.

### 2.  Biogen's Reliance Wholly on Subjective Criticism Is Evidence of Pretext

An employer relying simply on subjective criticisms suggests pretext. *Lilly v. Harris-Teeter Supermarket*, 842 F.2d 1496, 1506 (4th Cir. 1988); *Zacharias v. Guardsmark, LLC*, 2013 WL 136240 (D. Minn. 2013) (subjective reasons easily fabricated.); *Perfetti v. First Nat. Bank of Chicago*, 950 F.2d 449, 457 (7th Cir.1991) (discussing use of "subjective factors to camouflage discrimination"). Subjective practices are "particularly susceptible to discriminatory abuse and should be closely scrutinized." *Warren,* 58 F.3d at 443. The subjective nature of an employer's decision can be considered as circumstantial evidence of pretext. *Bergene v. Salt River Project Agr. Imp. and Power Dist.,* 272 F.3d 1136, 1142 (9th Cir. 2001). Here, Erickson was objectively ranked second-highest among her peers in sales. Brown 30(b)(6) Dep. at 42:8-43:19; Ex. 9. However, based on Brown's subjective opinions, Erickson was selected as the weakest. Brown 30(b)(6) Dep. at 29:17-21. Brown did not refer to sales data, performance reviews, field ride along reports, or any objective documentation. *Id*. at 28:2-8. Allison and Palacio ratified Brown's decision without question.

PLAINTIFF'S OPP TO DEF SJ MOTION - 15
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

### 3.  Biogen's Failure to Follow Its Own Policies Is Evidence of Pretext

By offering evidence that Biogen deviated from its established policy or practice in a manner that worked to her disadvantage, Erickson creates a material issue of fact as to pretext. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1116-17 (9th Cir. 2011) (citing *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1214 (9th Cir.2008); *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) (finding employer's departure from internal procedures probative evidence of pretext)). Violating policy is evidence of pretext. *Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 29 (1st Cir. 1998) (deviation from policy may show pretext); *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) (accord).  Here, Brown chose Erickson for termination without reviewing any of the guidelines provided by Biogen for assessing TBM performance. Brown 30(b)(6) Dep. at 28:2-8. These guidelines are to be used during performance reviews to ensure an objective, comprehensive assessment of each TBM and provide definitions to apply in competitively ranking TBMs as compared with their peers every six months. Ex. 5 at BGN001255. Brown referred to these guidelines in doing performance evaluations, but she did not refer to them in selecting Erickson for termination. Brown Dep. at 110:9-21. Additionally, in prior RIFs employees with less tenure were selected before employees with more tenure. Volkmann Dep. at 47:6-48:9. In the 2018 RIF, tenure was not considered because Brown decided to terminate Erickson based on her subjective opinion. 30(b)(6) Brown Dep. at 13:1-14:2; 21:5-24:5.

### 4.  Biogen's Failure to Investigate Erickson's Reports Is Evidence of Pretext

The lack of investigation into the reports made by Erickson is strong evidence of retaliation. *Boyd*, 187 Wn. App. at 873 (WSH failed to conduct a "thorough independent investigation" before discipline which supported pretext); *Trujillo v. PacifiCorp.*, 524 F.3d 1149, 1160 (10th Cir. 2008) (employer failed to interview key witnesses.); *Topper v.*

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

*Northwest Mechanical, Inc.*, 968 F.Supp.2d 1001, 1022-1027 (S.D. Iowa 2013) (finding "the investigation was so limited it is unlikely it was conducted in good faith.").  Here, there is strong evidence of pretext based on Biogen's complete failure to investigate Erickson's reports regarding Brown. First, Volkmann reports Brown in November 2017 to Allison. Volkmann Dep. at 55:5-56:1. Allison does not follow up on this report. *Id*. at 107:11-20. Erickson reports the same issue two months later to Palacio, at which time Palacio and Allison discuss the report. Palacio Dep. at 47:12-48:13. Without speaking with Volkmann or Erickson again, Palacio and Allison determine Volkmann's report was on behalf of Erickson, and thus that Erickson's report was not justified. *Id*. at 46:22-47:24; 70:19-71:25. Instead of investigating two employees' reports of gender discrimination, Palacio and Allison opt for verbal "coaching" of Brown. Allison Dep. at 183:1-184:15; Palacio Dep. at 69:1-22. This process violates Biogen's 13-step investigations protocol. *See* Ex. 20.

### 5.  The Timing of Biogen's decision to terminate Erickson is Evidence of Pretext

Finally, the timing of adverse actions is evidence of retaliation. *Korslund v. Dyncorp Tri-Cities Servs., Inc.*, 121 Wn. App. 295, 329, *aff'd*, 156 Wn.2d 168 (2005) ("This temporal proximity of events is circumstantial evidence of retaliation."); *Davis.*, 520 F.3d at 1094 ("causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity").  The Ninth Circuit has recognized that in some cases "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Villiarimo v. Aloha Island Air., Inc.,* 281 F.3d 1054, 1064–65 (9th Cir. 2002).  See also, *Dawson v. Entek Intern.,* 630 F.3d 928, 936 (9th Cir. 2011) ("the gravity of Dawson's complaints coupled with the time frame are such that a reasonable trier of fact could find in favor of Dawson on his retaliation claim."); *Bell v. Clackamas Cnty.,* 341 F.3d 858, 862–864, 866 (9th Cir. 2003) (temporal proximity sufficient where plaintiff had positive

PLAINTIFF'S OPP TO DEF SJ MOTION - 17
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

training scores prior to complaint of racial harassment, but poor reviews, suspension, and termination closely followed plaintiff's complaint). Here, the proximity in time between Erickson's December 2017 ethics complaint, January 2018 report regarding Brown, and the January 2018 termination decision is sufficient evidence for a jury to find causation.

## C.   Biogen Retaliated Against Erickson in Violation of the FCA

Federal law prohibits retaliation in response to lawful acts by an employee in furtherance of an action under the FCA. 31 U.S.C. § 3730(h). It is a violation of the FCA when someone "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." *See* 31 U.S.C. § 3729(a)(1)(A).  "A plaintiff alleging an FCA retaliation claim need not show that the defendant actually submitted a false claim to the government, only that he reasonably suspected as much." *Sicilia v. Boeing Co*., 775 F. Supp. 2d 1243, 1249 (W.D. Wash. 2011). The three elements to an FCA relation claim are: (1) the plaintiff engaged in activity protected by the statute; (2) the employer knew the plaintiff engaged in protected activity; and (3) the employer discriminated against the plaintiff because of the protected activity. *Moore v. California Inst. of Tech. Jet Propulsion Lab*., 275 F.3d 838, 845 (9th Cir. 2002).  Under federal law, "pharmaceutical manufacturers are generally prohibited from promoting off-label uses of their products if the off-label marketing is false or misleading, or if it evidences that a drug is intended for such off-label use and is therefore 'misbranded.'" *U.S. ex rel. Polansky v. Pfizer, Inc*., 822 F.3d 613, 615 (2d Cir. 2016) (quoting 21 U.S.C. § 352(f)(1)); *see also, United States ex rel. Solis v. Millennium Pharm., Inc*., 885 F.3d 623, 625 (9th Cir. 2018) (reversing the dismissal of part of claim where employee "alleged that his former employers violated state laws and the False Claims Act (FCA) by promoting dangerous off-label uses of Integrilin . . .."); *U.S. ex rel. Bergman v. Abbot Labs*., 995 F. Supp. 2d 357,

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

367 (E.D. Pa. 2014) (denying motion to dismiss FCA case based on allegation that "through its false and misleading marketing, [defendant] knowingly caused physicians to submit claims for reimbursement for off-label uses that did not meet the requirement for payment of medical necessity, it is liable for causing the submission of false claims under the FCA.").

Here, Erickson discovered her territory partner provided a Biogen START form to a hematologist to order ZINBRYTA for a Medicare patient for an off-label use treating aplastic anemia. Erickson Decl. at ¶ 9. Erickson was aware the Biogen START form would require the physician to falsely "certify that the rationale for prescribing ZINBRYTA therapy is for a primary diagnosis of ICD-9:340/ICD-9:340/ICD-10:G35 [Multiple sclerosis]. . . ." Ex. 14. Erickson opposed this event to Lykins, Brown, Allison, the compliance helpline, in house counsel Curto, and HR Manager Palacio. Erickson Decl. at ¶¶ 10-15. The physician in fact submitted the START form on behalf of the Medicare patient falsely certifying Zinbryta would be used to treat MS when it was intended to treat aplastic anemia. Ex. 19. Biogen had to ensure a commission was not paid on that sale. Brown Dep. at 90:1-92:7.

Biogen relies on two cases: *Sicilia v. Boeing Co.*, 775 F. Supp. 2d 1243, 1254 (W.D. Wash. 2011) and *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996). In *Sicilia*, the Court dismissed the FCA retaliation case, finding there was no objective basis to think Boeing violated the FCA, reasoning that the plaintiff failed to demonstrate any false claim, certification, intentional lie, or government contract contingent on certification. *Sicilia*, 775 F. Supp. 2d at 1254. Because the plaintiff could show "no nexus to the FCA," the court concluded "his belief that Boeing was defrauding the government is objectively unreasonable." *Id*. In contrast to *Sicilia*, Erickson was investigating the off-label use of a drug that would require the prescribing physician to falsely certify to Medicare that the drug was

PLAINTIFF'S OPP TO DEF SJ MOTION - 19
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

being ordered for its on-label use. Erickson investigated a specific example of this event, Biogen has claimed attorney-client privilege over the investigation it performed into Erickson's report, and Biogen took action to strip the sales employee of the commission following the report. In contrast to *Sicilia*, Erickson's report, if true, would be a specific violation of the FCA.

Biogen also relies on *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996), where the plaintiff was an educator who claimed a school district submitted false claims to the government actionable under the FCA by (1) annually submitting reports reconciling actual enrollment with predicted enrollment; (2) cashing checks received for special education, derived in part from federal funding; and (3) submitting certificates certifying that the district would meet all state and federal laws and regulations. The Ninth Circuit affirmed the dismissal reasoning that "the School District did not make a certification which could constitute a 'false claim' under the Act, much less a false statement which caused the United States to provide an improper benefit." *Id*. at 12166.  The court also determined that the claim for retaliation was unsupported for similar reasons, holding the employee "was not investigating fraud" and that "the thrust of her complaints was that the School District was failing to meet its IDEA obligations to its students. Correcting regulatory problems may be a laudable goal, but one not actionable under the FCA in the absence of actual fraudulent conduct." *Id*. at 1269.  In contrast to *Hopper*, Erickson was investigating a specific example of false certification to Medicare, which would be a fraudulent act under the FCA. Biogen's claim that Erickson's activities are objectively unreasonable is belied by its own action of stripping the commission on the sale at issue, its own internal policies to avoid this type of scenario, and the prohibitions on false claims and false statements set forth by 31 U.S.C. § 3729(a)(1)(A)-(B) (creating liability for when a party "knowingly presents, or causes to be presented, a false or

PLAINTIFF'S OPP TO DEF SJ MOTION - 20
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

fraudulent claim for payment or approval; [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]").

Next, Biogen makes the factually inaccurate claim that it could not have retaliated against Erickson because the individuals involved in the termination decision were unaware of her Zinbryta report. Dkt 50 at 22. However, Erickson directly communicated with Brown and Allison through her opposition to the Zinbryta sale. Erickson Decl. at ¶¶ 10-12. Additionally, Brown concedes that attorney Curto spoke with her in the scope of his investigation into Erickson's claims and she was directed to take action to stop any commission payments on the START form. Brown Dep. at 90:1-92:7. Biogen has asserted privilege over the content of these communications and neither Curto nor Brown have disclosed the content of these communications.  See Dkt. No. 40 at 5 (holding "Defendant has not waived its attorney-client privilege with respect to Mr. Curto's investigation into Plaintiff's allegations involving an FCA violation."). As recognized by the Ninth Circuit, "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield." *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc*., 259 F.3d 1186, 1196 (9th Cir. 2001). Therefore, "'where the party claiming privilege during discovery wants to testify at the time of trial, the court may ban that party from testifying on the matters claimed to be privileged.'" *Id*. (quoting William A. Schwarzer, et al., *Federal Civil Procedure Before Trial*, ¶11:37 at 11–29 (2000)). Finally, Palacio knew of Erickson's claims because she discussed them directly with her in January and February 2018. Palacio Dep. at 143:14-148:8 Brown, Allison, and Palacio made the decision to terminate Erickson in the 2018 RIF.

PLAINTIFF'S OPP TO DEF SJ MOTION - 21
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

D.      Biogen Discriminated on a Perceived Disability In Violation of WLAD and ADA

In order to present a *prima facie* claim for violating the ADA, a "Plaintiff 'must show that (1) [he] is a disabled person within the meaning of the ADA; (2) [he] is a qualified individual, meaning [he] can perform the essential functions of [his] job; and (3) Defendant terminated [him] because of [his] disability.'" *Kirbyson v. Tesoro Refining*, 795 F. Supp. 2d 930, 942 (N.D. Cal. 2011). Migraines have been recognized as a disability by this Court under the WLAD and the ADA. *See Stewart v. Snohomish County PUD No. 1*, 2017 WL 2665105 at * 8-9 (W.D. Wash. June 21, 2017). However, with a "perceived" or "regarded as" disability discrimination claim, the plaintiff "meets the requirement of "being regarded as having such an impairment" if she "establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment **whether or not the impairment limits or is perceived to limit a major life activity**." 42 U.S.C. § 12102(3)(A); *Nunies v. NIE Holdings, Inc.*, 908 F.3d 428, 434 (9th Cir. 2018) (emphasis added). While under federal law, the perceived impairment cannot be "transitory and minor," this is statutorily defined as "an impairment with an actual or expected duration of 6 months or less." 42 U.S.C.A. § 12102(3)(B). Under Washington law, "it is enough to show that the employer discriminated against the plaintiff because it perceived the plaintiff to be suffering from an impairment", whether one in fact exists. *Taylor v. Burlington Northern RR Holdings, Inc.*, 2019 WL 3023161 (Wash. July 11, 2019); RCW 49.60.040(7)(a)(iii). WLAD broadly explains that "[a] disability exists whether it is temporary or permanent, . . ., or whether or not it limits the ability to work generally or work at a particular job or whether or not it limits any other activity within the scope of this chapter." RCW 49.60.040(7)(b).

Here, Erickson has suffered from migraines for approximately ten years that present as a sharp, stabbing pain in her eyes paired with pounding pain in her head and neck, and which

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

on a pain scale of 1 to 10 often are at a level of 8. Erickson Decl. at ¶ 5; Galvon Decl. at ¶¶ 3-4. Erickson's migraines are severely debilitating and can be of substantial duration. Galvon Decl. at ¶¶4-5. Erickson has a disability and Brown treated her as having a disability by making comments about her health and choosing her for termination.

### E.   Biogen Discriminated Based on Gender In Violation of WLAD and Title VII

Under the circumstantial evidence test, and in the context of a reduction in force, a plaintiff can prove gender discrimination by showing "(1) that she belongs to a protected class; (2) that she was discharged from a job for which she was qualified; and (3) that others not in her protected class were treated more favorably."  Washington, 10 F.3d at 1434. Indeed, "[a] plaintiff laid off during a reduction in force will generally have to rely on evidence giving rise to an inference of discrimination . . . because the plaintiff is unlikely to have been replaced." *Schechner v. KPIX-TV*, 686 F.3d 1018, 1023 (9th Cir. 2012).  "This inference can be established by showing the employer had a continuing need for [their] skills and services in that [their] various duties were still being performed," or by showing "that others not in [their] protected class were treated more favorably."  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000) (internal quotations and citations omitted).  Likewise, the WLAD applies the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) test in a non-rigid fashion. *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cty.*, 189 Wn.2d 516, 532, (2017).

Here, Erickson is female, was discharged from her job after receiving routinely positive performance reviews, and her male colleague with less tenure took over her sales territory after she was terminated. Brown Dep. at 184:3-15. This occurred after Erickson reported concerns of gender and disability discrimination from the same manager who made the subjective decision to terminate her employment.

PLAINTIFF'S OPP TO DEF SJ MOTION - 23
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

**F.      Erickson's Termination Violates Public Policy**

Because the tort is a narrow exception to at will employment, wrongful discharge claims were traditionally limited to four recognized scenarios, one of which is where employees are fired in retaliation for reporting employer misconduct, *i.e.*, whistleblowing. *Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 936 (1996) (citing *Dicomes v. State*, 113 Wn.2d 612, 618 (1989)). Situations that do not fall into these four traditional may still be covered, subject to the four-part *Perritt* test adopted by the Washington Supreme Court in *Gardner*. *Id.* at 940.  Because this case falls into whistleblowing, one of the four traditionally recognized categories of termination in violation of public policy, a *Perritt* analysis, and by extension an overriding justification argument, is inapplicable here. *Martin v. Gonzaga University*, 425 P.3d 837, 842-44 (2018), holds that a *Perritt* analysis is <u>not applied</u> where the public policy-linked conduct fits squarely within one of the four traditionally recognized categories. This clarified earlier inconsistencies on this issue. *Martin* held that "the Court of Appeals erred by applying the *Perritt* test instead of using the standard enunciated in *Thompson* and further refined in *Wilmot v. Kaiser Aluminum & Chemical Corp*., 118 Wn.2d 46, 821 P.2d 18 (1991)." *Id.* at 843-44.

In any of the four traditional public policy scenarios, a *prima facie* case requires only two parts: First, the Plaintiff "has the burden to show that his 'discharge may have been motivated by reasons that contravene a clear mandate of public policy.'" *Id.* at 844 (quoting *Thompson*, 102 Wn.2d at 232). "The question of what constitutes a clear mandate of public policy is one of law and can be established by prior judicial decisions or constitutional, statutory, or regulatory provisions or schemes." *Martin*, 425 P.3d at 844; *Dicomes*, 113 Wn.2d at 617. Second, the Plaintiff must "show that the public-policy-linked conduct was a

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

'significant factor' in the decision to discharge the worker." *Martin*, 425 P.3d at 844 (quoting *Wilmot*, 118 Wn.2d at 75). "The plaintiff must first establish a *prima facie* case by producing evidence that the public-policy-linked conduct was <u>a cause</u> of the firing, and may do so by circumstantial evidence." *Id*. (emphasis added). If the plaintiff succeeds in presenting a *prima facie* case, and the employer puts forth a legitimate reason, the plaintiff then must show pretext either by showing that the reason is pretextual, or by showing that even if the employer's stated reason is legitimate, "the public-policy-linked conduct was nevertheless a substantial[10] factor in motivating the employer to discharge the worker." *Id*.

In the Medicaid context, Washington law prohibits any person, including corporations, from knowingly presenting a "fraudulent claim for payment," causing a "a false record or statement material to a false or fraudulent claim" to occur, or conspiring to do the same. RCW 74.66.020(1). Furthermore, the CPA can be violated when a drug company engages in "unfair or deceptive trade practice by failing to warn the physician of the dangers of its drug about which it had knowledge." *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp*., 122 Wn.2d 299, 311, 858 P.2d 1054, 1060 (1993). Here, Biogen's termination of Erickson is contrary to RCW 74.66.090 and the clear public policy established by RCW Chapter 74.66 and the FCA. Erickson has a claim as a matter of public policy for the same reasons she has a claim for retaliation under the federal FCA. The Washington Consumer Protection Act also prohibits fraudulent acts by pharmaceutical companies and therefore Washington Court would recognize that any employee who speaks out against such actions, like Erickson, and is later terminated for this opposition would have a claim for termination in violation of public policy.

---

[10] The Washington Supreme Court uses both "significant" and "substantial" to refer to the standard of the motivating factor for termination.

PLAINTIFF'S OPP TO DEF SJ MOTION - 25
[2:18-cv-01029-JCC
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

1

### IV.   CONCLUSION

2       Plaintiff respectfully requests that this Court deny Defendant's motion.

3       Dated this 26th day of August, 2019.

4                       GORDON THOMAS HONEYWELL LLP

5                       By: /s/ Stephanie Bloomfield

6                               Stephanie Bloomfield, WSBA No. 24251
                                sbloomfield@gth-law.com
7                               James W. Beck, WSBA No. 34208
                                jbeck@gth-law.com
8                               Janelle Chase-Fazio, WSBA No. 51254
                                jchasefazio@gth-law.com
9                               Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF'S OPP TO DEF SJ MOTION - 26
[2:18-cv-01029-JCC]
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565

1

## CERTIFICATE OF SERVICE

2

3       I HEREBY CERTIFY that on this date, I served the attached pleading on all Counsel

of Record via CM/ECF electronic email service as follows:

4

5       Mike Griffin, WSBA No. 29103
        Daniel P. Crowner, WSBA No. 37136

6       Jackson Lewis PC
        520 Pike Street, Ste. 2300

7       Seattle, WA  98101
        (206) 626-6416 direct

8       Michael.griffin@jacksonlewis.com
        Daniel.Crowner@jacksonlewis.com

9

10

11      DATED this 26th day of August, 2019.

12                                          /s/ Christine L. Scheall_____
                                            Christine L. Scheall, Legal Assistant

13                                          Gordon Thomas Honeywell LLP

14

15

16

17

18

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE - 1
[4846-2819-0366]

LAW OFFICES
GORDON THOMAS HONEYWELL LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500  -  FACSIMILE (253) 620-6565