UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DANITA ERICKSON, | CASE NO. C18-1029-JCC |
| Plaintiff, | ORDER |
| v. | |
| BIOGEN, INC., | |
| Defendant. | |

This matter comes before the Court on Plaintiff Danita Erickson's motion for partial summary judgment (Dkt. No. 48) and Defendant Biogen, Inc.'s motion for summary judgment (Dkt. No. 50). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part Plaintiff's motion and DENIES Defendant's motion for the reasons explained herein.

## I.     BACKGROUND

Defendant is a pharmaceutical company that produces and markets products to treat serious diseases, primarily multiple sclerosis. (*See* Dkt. No. 1 at 2.) In 2011, Defendant hired Plaintiff to work in its sales division as a territory business manager ("TBM"). (Dkt. No. 51 at 90–91.) She was responsible for a territory within Defendant's Northwest region, which includes Washington, Oregon, Idaho, and Alaska. (*Id.*) The Northwest region had a total of 10 TBMs in late 2017 and early 2018. (Dkt. No. 53 at 1.) By January 2017, Mary Brown was the regional

director for the Northwest region. (Dkt. No. 51 at 8.) Plaintiff reported to Brown from 2017 to 2018. (*Id.* at 90.)

Plaintiff had experienced migraine headaches for about 10 years prior to the events in question. (Dkt. No. 49 at 8.) While employed for Defendant, Plaintiff experienced very few migraines while traveling for work. (*Id.* at 11.) On September 5, 2017, during a sales trip in Alaska, she experienced a debilitating migraine. (*Id.* at 6–7.) Brown was with Plaintiff and helped her through the migraine. (*Id.* at 53–54.) At a work event about a week later, James Lykins, Plaintiff's sales partner and fellow TBM, mentioned to Brown that Plaintiff had a migraine on a different sales trip. (*Id.* at 13–14, 84–85.) Brown pulled Lykins aside and told him that she appreciated his concern, but they should not be discussing Plaintiff's medical condition. (Dkt. No. 51 at 178.) Plaintiff maintains that following these incidents, Brown spoke to her on multiple occasions about her migraine condition and became concerned about her ability to travel for work. (Dkt. Nos. 49 at 10–11, 62 at 5.) Plaintiff also states that Brown recommended she seek a different job. (Dkt. No. 49 at 10–11.) Brown asserts that she never made such a statement and instead expressed support and offered possible accommodations. (*See* Dkt. No. 51 at 12, 59–62.)

While employed by Defendant, Plaintiff had been trained annually on her duty to report suspected violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729, by the off-label use, promotion, or sale of prescription drugs. (Dkt. No. 49 at 24.) In 2017, Defendant marketed and sold the drug Zinbryta. (Dkt. No. 1 at 2.) Zinbryta had been approved by the Food and Drug Administration in a limited capacity—to treat multiple sclerosis patients who had an inadequate response to other treatments. (*Id.* at 4.) It is a FCA violation to promote off-label use of prescription drugs to Medicare patients. *See* 31 U.S.C. § 3729(a)(1); (Dkt. No. 49 at 25–26.)

Before a doctor can enroll a patient in certain drug therapy regimens, the doctor must complete and submit a "START Form" to the pharmaceutical manufacturer. (*See* Dkt. No. 53 at 2.) Defendant's Zinbryta START form requires the doctor to specify the patient's diagnosis,

certify that the diagnosis is the rationale for prescribing the drug, and further certify that the doctor will supervise the patient's treatment accordingly. (Dkt. No. 64 at 209–10.) Defendant's Zinbryta START form is pre-filled with the International Classification of Disease ("ICD") codes for multiple sclerosis, and by signing the START form, the doctor "certifies that the rationale for prescribing ZINBRYTA therapy is for a primary diagnosis of ICD-9:340/ICD-10:G35." (*Id.* at 209–10.)

In the fall of 2017, shortly after Plaintiff's sales trip to Alaska, Lykins told Plaintiff that a doctor had contacted him about providing Zinbryta to an aplastic anemia patient for off-label use. (Dkt. No. 49 at 91.) Plaintiff told Lykins that she believed it would be improper for him to deliver the forms because they involved an off-label use of Zinbryta. (*Id.*) In November 2017, Plaintiff expressed her opposition to Lykins's involvement with providing Zinbryta to the aplastic anemia patient to Brown at a meeting with Western division manager Zachary Allison. (Dkt. No. 51 at 102.) On November 17, 2017, Plaintiff was copied on an email that stated that the patient's insurance company had approved the patient for Zinbryta, and that Lykins planned to deliver the START form so the patient could get enrolled. (Dkt. No. 55 at 2, 6–8.) On December 6, 2017, Plaintiff submitted a complaint to Defendant's ethics hotline to report Brown and Lykins's involvement with the off-label Zinbryta sale. (*Id.* at 102.) In her report, she also stated she was in fear of retaliation by Brown for her opposition. (Dkt. No. 75 at 16.) Shortly thereafter, Dan Curto, Defendant's in-house counsel, followed up with Plaintiff about her ethics complaint. (*Id.* at 16.) Curto also followed up with Brown about Plaintiff's complaint. (Dkt. No. 64 at 72–73.)

In mid-January, Plaintiff contacted Defendant's human resources partner Keri Palacio to follow up further about the ethics complaint. (Dkt. No. 75 at 17.) On January 25, 2018, Plaintiff spoke to Palacio about the ethics complaint. (*Id.*) Additionally, Plaintiff raised a new concern: that Brown treated men more favorably than women. (Dkt. No. 62 at 2–3.) Plaintiff asserted she had observed Brown favoring male TBMs over females, tending to call on them more, assigning

them to committees, supporting their promotions, and assigning them more advanced tasks. (*Id.*) Plaintiff also maintains that she reported to Palacio that Brown had been treating her unfavorably since Brown witnessed Plaintiff's migraine. (Dkt. No. 51 at 76–77, 298.) Palacio denies that Plaintiff reported that she had a migraine condition or that she was being treated differently because of it. (*Id.* at 191, 194, 202–203.)

Defendant evaluated TBM performance every six months in the form of "OPR" ratings. (Dkt. No. 64 at 74.) Plaintiff had consistently received competent 2/2 OPR ratings. (*Id.* at 65, 135.) In early 2018, Defendant decided to restructure its national workforce and determined that some TBM positions would be eliminated due to a reduction in force. (Dkt. No. 20 at 2.) One of the four TBM positions in Plaintiff's territory was to be eliminated. (Dkt. No. 19 at 2.) On January 31, 2018, Brown and Allison listed Plaintiff as a "bottom performer" identified for "realignment," *i.e.*, termination. (Dkt. Nos. 64 at 44, 66 at 42–45.) In early February 2018, Brown completed her review of Plaintiff's performance for the second half of the previous year, once again assigning Plaintiff a 2/2 OPR rating. (*Id.* at 65.)

In mid-February 2018, Defendant provided its managers three criteria to use in selecting TBMs for termination: OPR ratings, sales competencies, and tenure. (*Id.* at 27, 29, 79–80; *see* Dkt. No. 20 at 2.) Brown was responsible for rating the TBMs in her region and deciding whom to terminate, with input from Palacio and Allison. (Dkt. No. 19 at 2.) On the first criterion, all four TBMs had the same OPR rating of 2/2. (*Id.*) On the second criterion, Brown evaluated Plaintiff, Lykins, and the other TBMs on three sales competencies specified by Defendant: sales disposition, customer-focusing selling, and territory and account planning. (*Id.*) Brown rated Plaintiff as "developing" for customer-focused selling. (*Id.*) This gave her the lowest score of the four TBMs. (*Id.*) Brown did not consider the third criterion, tenure, as Plaintiff had the lowest score amongst the four TBMs for the second criterion. (Dkt. No. 64 at 77–78.) Brown completed the evaluation in March 2018. (Dkt. No. 19 at 2.) On March 20, 2018, Plaintiff was notified she had been identified for termination. (Dkt. Nos. 1 at 13, 51 at 80.) She was terminated in April

2018. (*Id.*)

Plaintiff brings gender and disability discrimination and retaliation claims under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C § 12101–02, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e), and Washington's Law Against Discrimination ("WLAD"), Wash. Rev. Code. § 49.60. (Dkt. No. 1 at 14–18.)[1] Plaintiff also brings a retaliation claim under the FCA, 31 U.S.C. § 3730(h), and a tort claim of wrongful termination in violation of public policy under Washington law, citing Washington's Consumer Protection Act ("CPA"), Wash. Rev. Code § 19.86.020. (*Id.*)

Plaintiff now moves for summary judgment on two of Defendant's affirmative defenses,[2] for a determination that she is disabled as a matter of law under the ADA and WLAD, and for a determination that she engaged in protected activity as a matter of law under the ADA, Title VII, WLAD, and the FCA. (*See* Dkt. No. 48.) Defendant moves for summary judgment on all of Plaintiff's claims. (*See* Dkt. No. 50.)

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that

---

[1] The Court granted the parties' stipulated motion to dismiss with prejudice Plaintiff's claim of age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 626. (*See* Dkt. No. 83.)

[2] The Court granted the parties' stipulated motions to strike Defendant's fourth affirmative defense of undue hardship; fifth affirmative defense of good faith as to liability; sixth affirmative defense of job-relatedness/business necessity; and seventh affirmative defense of undue hardship. (*See* Dkt. Nos. 44, 83.)

there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990). Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catlett*, 477 U.S. 317, 324 (1986).

### B. *McDonnell Douglas* **Framework**

Plaintiff's federal and state law discrimination and retaliation claims are governed by the familiar *McDonnell Douglas* burden-shifting framework. *See Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1105–06 (9th Cir. 2008) (Title VII); *Curley v. City of N. Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) (ADA); *Hines v. Todd Pac. Shipyards*, 112 P.3d 522, 529 (2005) (WLAD). The WLAD largely mirrors federal law, and "courts should look to interpretations of federal anti-discrimination laws, including the ADA, when applying the WLAD." *See Grill v. Costco Wholesale Corp.*, Case No. C03-2450-TSZ, Dkt. No. 32 at 8 (W.D. Wash. 2004). Under the burden-shifting framework, Plaintiff must first establish a *prima facie* case of discrimination or retaliation. *Curley*, 772 F.3d at 632. If she succeeds, then the burden shifts to Defendant to offer a legitimate explanation for Plaintiff's termination. *Id*. If Defendant does, the burden shifts back to the Plaintiff to show that Defendant's explanation is pretext for discrimination or retaliation. *Id*.

### C. **Disability Discrimination**

To establish a *prima facie* case of disability discrimination under the ADA or WLAD, Plaintiff must show that: "(1) [she] is disabled within the meaning of the ADA; (2) [she] is qualified (i.e., able to perform the essential functions of the job with or without reasonable

accommodation); and (3) the employer terminated [her] because of [her] disability." *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 433 (9th Cir. 2018) (ADA); *see Hines*, 112 P.3d at 529 (WLAD).

### 1. Plaintiff's Migraine Condition

The ADA defines "disability" as "(1) 'a physical or mental impairment that substantially limits one or more of the major life activities of such individual;' (2) 'a record of such an impairment;' or (3) 'being regarded as having such an impairment.'" *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1231 (9th Cir. 2003) (quoting 42 U.S.C. § 12102(2)). The ADA defines "major life activities" to include "working" as well as the "operation of a major bodily function," including neurological functions. 42 U.S.C. § 12102. "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." 29 C.F.R. § 1630.2. The WLAD similarly defines "disability" as: "the presence of a sensory, mental, or physical impairment that: (i) is medically cognizable or diagnosable; or (ii) exists as a record or history; or (iii) is perceived to exist whether or not it exists in fact." Wash. Rev. Code § 49.60.040(7)(a).

Plaintiff argues she is entitled to a determination that her migraine condition constitutes an actual or perceived disability under the ADA and WLAD as a matter of law.[3] (Dkt. No. 48 at

---

[3] Defendant argues that Plaintiff admitted in a previous filing she is not disabled. (Dkt. No. 50 at 10.) In Plaintiff's motion for a protective order regarding her migraine medical records, she stated that:

> Plaintiff is not claiming that she was "disabled," but asserts that her boss perceived her as so after witnessing the migraine episode, and then discriminated and retaliated against her as a result of her discriminatory perceptions and retaliated against Plaintiff for her protected activity relating to improperly seeking a commission for the off-label use of a MS drug by a Medicare patient in violation of the False Claims Act.

(Dkt. No. 28 at 3.) The Court has already declined to treat Plaintiff's statement as conclusive. (*See* Dkt. No. 47 at 3) (denying Plaintiff's motion for protective order on the ground that Plaintiff's alleged disability made her medical records relevant); *see also Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) (holding that a court has discretion to consider whether a statement of fact contained in a brief may be considered an admission).

8–10.) A sufficiently severe migraine condition may constitute an actual impairment. *See, e.g.*, *Kimbro v. Atl. Richfield Co.*, 889 F.2d 869, 873 (9th Cir. 1989) (finding acute cluster migraines causing absenteeism constituted disability under the WLAD); *Stewart v. Snohomish Cty. PUD No. 1*, Case No. C16-0020-JCC, Dkt. No. 72 at 14–15 (W.D. Wash. 2017) (finding side effects of migraine medication constituted disability under the WLAD); *but see Swart v. Premier Parks Corp.*, 88 F.App'x 366, 371 (10th Cir. 2004) (finding no disability where plaintiff experienced three or four migraines per week, but they did not prevent her from work or other life activities).

Plaintiff has offered a declaration from her doctor stating that Plaintiff often suffers from severe migraines multiple times per month and has experienced them since before 2013. (Dkt. No. 63 at 2.) Plaintiff takes medication for them as needed. (*Id.* at 2.) Defendant observes that Plaintiff did not miss any work due to a migraine between September 5, 2017 and April 3, 2018, and her condition has not prevented her from competing in a marathon. (Dkt. No. 67 at 5.) Because of the conflicting evidence about the severity of Plaintiff's migraine condition, questions of fact remain as to whether Plaintiff's migraines *substantially* limit at least one life activity. Thus, Plaintiff has not established that her migraine condition is an actual impairment under the ADA or WLAD as a matter of law. *See Kaplan*, 323 F.3d at 1231.

Plaintiff may also bring a claim as a perceived (or "regarded-as") disability claim. *See Nunies*, 908 F.3d at 434. In a perceived disability claim, there is no requirement that the perceived impairment limit (or be perceived to limit) a major life activity. *Id.* Defendant may defeat Plaintiff's perceived impairment claim by showing the perceived impairment was transitory or minor. *Id.*

Defendant was aware that Plaintiff experienced migraines because Brown observed Plaintiff's migraine in September 2017. (Dkt. No. 49 at 53.) Brown also had subsequent conversations that month with Plaintiff and Lykins about Plaintiff's condition. (*Id.* at 10–11, Dkt. No. 62 at 2.) Plaintiff states that Brown recommended she find other employment, (*see* Dkt. No. 62 at 2), but Brown maintains she never made that statement (*see* Dkt. No. 51 at 12). In the

months that followed, there is no evidence that Brown made further comments about Plaintiff's migraine condition. Plaintiff did not miss any days of work due to migraines, nor did she request accommodations. (Dkt. No. 67 at 5.) There is no other objective evidence that Defendant continued to perceive Plaintiff as impaired. For that reason, a jury could find that Defendant perceived the condition as transitory and minor. Thus, Plaintiff has not carried her burden to show that Defendant perceived her as impaired. *See Nunies*, 908 F.3d at 434. Plaintiff has not established that she is disabled under the ADA or WLAD as a matter of law. Therefore, Plaintiff's motion is DENIED on this ground. *See id.*

Nonetheless, Plaintiff has offered sufficient evidence for a reasonable jury to find she is actually impaired or was perceived as impaired. (*See* Dkt. Nos. 49 at 10–11, 62 at 2–5, 63 at 2). Therefore, for the purpose of Defendant's motion for summary judgment, Plaintiff has established the first prong of her *prima facie* case for the federal and state law disability claims.

### 2. Qualified

It is not in dispute whether Plaintiff was qualified for her position, so the second prong of Plaintiff's *prima facie* case is satisfied. *See Nunies*, 908 F.3d at 433.

### 3. Causation

As to the third prong of Plaintiff's *prima facie* case, causation, Plaintiff must show that she was terminated because of her disability. *See Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019) ("We join our sister circuits in holding that ADA discrimination claims under Title I must be evaluated under a but-for causation standard."). Taking the evidence in the light most favorable to Plaintiff, Brown's suggestion that Plaintiff should look for a different job demonstrates discriminatory animus. (*See* Dkt. No. 51 at 12.) And when Defendant directed Brown to select a TBM for termination, Brown chose Plaintiff. (*See* Dkt. No. 19 at 2, 64 at 77–90.) This is sufficient evidence for a reasonable jury to find that Brown terminated Plaintiff out of discriminatory animus. *Nunies*, 908 F.3d at 433. Thus, Plaintiff has established her *prima facie* case for disability discrimination.

4. <u>Defendant's Explanation for Termination</u>

Because Plaintiff has stated a *prima facie* case of disability discrimination, the burden shifts to Defendant to produce "a legitimate, nondiscriminatory . . . reason for the adverse employment action." *See Curley*, 772 F.3d at 632. An employer's decision to reduce its number of employees can constitute a legitimate, non-discriminatory explanation for terminating an employee. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000).

In early 2018, Defendant decided to carry out a national reduction in force and determined that it needed to eliminate one out of four TBMs in Plaintiff's territory. (Dkt. No. 20 at 2.) Defendant directed Brown to determine which TBM would be terminated by applying three neutral criteria. (*Id.*) After evaluating the four TBMs based on the three criteria, Brown selected Plaintiff for termination. (Dkt. No. 64 at 79-80.) Brown reviewed the decision with Palacio and Allison. (*Id.*) Defendant argues that its reduction in force offers a non-discriminatory explanation for Plaintiff's discharge. (Dkt. No. 50 at 9.) Thus, Defendant has satisfied its burden of production. *See Curley*, 772 F.3d at 632.

5. <u>Pretext</u>

Since Defendant has produced a legitimate, nondiscriminatory explanation for termination, the burden shifts back to Plaintiff to prove Defendant's explanation is pretextual. *Curley*, 772 F.3d at 632. Under the *McDonnell-Douglas* framework, Plaintiff "can prove pretext in two ways: (1) indirectly, by showing that [Defendant's] proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated [Defendant.]" *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998)).

Plaintiff has offered evidence that suggests that Defendant's reduction in force is a pretextual explanation for her termination. First, Brown identified Plaintiff for "realignment" on or before January 31, 2018, weeks before Defendant provided Brown three neutral criteria to

select a TBM for termination. (*See* Dkt. Nos. 64 at 44, 66 at 42–45.) This is indirect evidence of pretext because it shows an internal inconsistency in Defendant's explanation. *See Chuang*, 225 F.3d at 1127. Second, Plaintiff has offered evidence that after Brown learned of Plaintiff's migraine condition, she suggested that Plaintiff should seek other work. (Dkt. No. 49 at 9–10.) Because Brown was responsible for rating Plaintiff's performance, (*see* Dkt. No. 64 at 79–80), Brown's rating could have been infected with Brown's discriminatory bias against Plaintiff. *See Chuang*, 225 F.3d at 1127. Thus, Plaintiff has demonstrated a material question of fact as to whether Defendant's proffered explanation for her termination—the reduction in force—is pretext for discrimination against Plaintiff. *See Curley*, 772 F.3d at 632. Therefore, Defendant's motion for summary judgment is DENIED as to Plaintiff's disability discrimination claims.

### D.    Sex Discrimination

For her Title VII claim for wrongful termination based on sex, Plaintiff must make a *prima facie* showing that: (1) she performed her job satisfactorily; (2) she experienced an adverse employment action; and (3) she was treated less favorably than male employees. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). The WLAD requires substantially the same elements to show discriminatory discharge based on sex. *See Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cty.*, 404 P.3d 464, 473 (Wash. 2017). Plaintiff is not required to show she was replaced by a male employee. *See Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir. 1993); *Mikkelsen*, 404 P.3d at 473.

First, Plaintiff has shown that she received satisfactory job ratings prior to her termination. (*See* Dkt. No. 64 at 65, 135.) Second, Plaintiff was terminated from her job. (Dkt. No. 51 at 80.) Third, Plaintiff has offered some evidence that she was treated less favorably than her male colleagues: neither of the two male TBMs in Plaintiff's territory were selected for termination. (*See* Dkt. No. 64 at 48.) Furthermore, Matt Chapman, Plaintiff's male colleague with less tenure, was assigned her territory after she left. (*Id.* at 205.) Thus, Plaintiff has presented a *prima facie* case for wrongful termination on the basis of sex. *See Cornwell*, 439

F.3d at 1028.

As discussed above, Defendant has produced a legitimate, non-discriminatory explanation for why Plaintiff was terminated: during a national reduction in force that eliminated a TBM position in her territory, Plaintiff was selected for termination based on neutral criteria. *See supra* Section II.C. Plaintiff must show that this explanation is pretext for Defendant's discriminatory decision. *See Surrell*, 518 F.3d 1105–06. Plaintiff has offered her observations that Brown favored male employees by calling on them in meetings, assigning them to committees, supporting their promotions, and assigning them more advanced tasks as compared to female employees. (Dkt. No. 62 at 2–3). Two other employees, Sara Lenoue and Shane Volkman, also observed that Brown tended to treat men more favorably. (*See* Dkt. No 64 at 42–43, 162–63.) This evidence suggests Brown was biased in favor of men. Thus, Plaintiff has shown enough evidence for a jury to decide that Defendant's explanation for her termination was pretextual. *See Surrell*, 518 F.3d 1105–06. Therefore, Defendant's motion for summary judgment is DENIED as to Plaintiff's sex discrimination claims.

### E.       Retaliation for Reporting Discrimination

The ADA, Title VII, and the WLAD prohibit retaliation for reporting discrimination. *See* 42 U.S.C. § 12203; 42 U.S.C. § 2000e-3(a); Wash Rev. Code § 49.60.210. Courts use a three-step burden-shifting framework to determine whether an ADA or Title VII retaliation claim should survive summary judgment. *See Curley*, 772 F.3d at 632 (ADA); *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1107–08 (9th Cir. 2008) (Title VII); *Francom v. Costco Wholesale Corp.*, 991 P.2d 1182, 1191 (Wash. Ct. App. 2000) (WLAD). Plaintiff must first establish a *prima facie* case, which requires proof that: (1) Plaintiff engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two. *See Curley*, 772 F.3d at 632. Plaintiff engaged in protected activity if she opposed an employment practice based on a reasonable belief that the practice was unlawful. *See E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983).

1.    <u>Protected Activity</u>

Plaintiff moves for a determination that she engaged in protected activity as a matter of law by reporting discrimination on the basis of disability and sex. (*See* Dkt. No. 48 at 8–13.)

a.    *Reporting Disability Discrimination*

Plaintiff states that she told Curto that she believed Brown treated her in a discriminatory manner because of her migraine condition. (*See* Dkt. No. 75 at 15).[4] Plaintiff asserts that in January 2018, she told Palacio that Brown had made numerous comments about Plaintiff's migraines, (*See* Dkt. No. 1 at 11), and that Brown had been treating her unfavorably since Brown witnessed Plaintiff's migraine (*See* Dkt. No. 51 at 76–77, 298). Palacio denies that Plaintiff ever made that report. (*Id.* at 191, 194, 202–203.) There is no other corroborating evidence. Thus, there are material facts in dispute as to whether Plaintiff engaged in protected activity by reporting Brown's alleged discrimination. *See E.E.O.C.*, 720 F.2d at 1013. Therefore, Plaintiff's request for a determination that she engaged in protected activity as a matter of law by reporting disability discrimination under the ADA and the WLAD is DENIED.

Nonetheless, the above facts also present sufficient evidence for a jury to find Plaintiff engaged in protected activity under the ADA and the WLAD. *See Curley*, 772 F.3d at 632. Therefore, for the purpose of Defendant's summary judgment motion, Plaintiff has established this element of her *prima facie* ADA retaliation case.

b.    *Reporting Sex Discrimination*

In January 2018, Plaintiff told Palacio that she believed Brown treated men more favorably than women in the workplace, providing several specific examples. (Dkt. Nos. 49 at 53; 51 at 192–93.) Palacio noted this statement in her computer file and also discussed it with Allison. (Dkt. No. 51 at 192–93.) A reasonable employee in Plaintiff's position would believe that such differential treatment based on sex would constitute an unlawful employment practice.

---

[4] Defendant has invoked attorney-client privilege to protect records of Plaintiff's communications with Curto. (*See* Dkt. No. 74 at 6.)

*See E.E.O.C.*, 720 F.2d at 1013. Therefore, Plaintiff engaged in protected activity under Title VII and the WLAD by reporting discrimination on the basis of sex. *See id*. Therefore, Plaintiff's motion for summary judgment is GRANTED as to this ground. For the same reason, for the purpose of Defendant's summary judgment motion, Plaintiff has established this element of her *prima facie* Title VII and WLAD retaliation case. *See Surrell*, 518 F.3d at 1107–08.

### 2.   ADA, Title VII, and WLAD Retaliation Claims

To show the necessary causal link for her federal retaliation claims, Plaintiff must demonstrate that her protected activity was the "but-for cause" of her termination. *Hodges v. CGI Fed. Def. & Intelligence*, 727 F.App'x 236, 238 (9th Cir. 2018) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)) (Title VII); *T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 473 (9th Cir. 2015) (ADA). For her WLAD retaliation claims, Plaintiff need only prove that her statutorily protected activity was a "substantial factor" in Defendant's adverse employment decision. *See Francom*, 991 P.2d at 1191; *Allison v. Housing Auth.*, 821 P.2d 34, 38 (Wash. 1991).

Plaintiff may establish causation with "circumstantial evidence, such as the employer's knowledge that [she] engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). "But timing alone will not show causation in all cases; rather, 'in order to support an inference of retaliatory motive, the termination must have occurred 'fairly soon after [Plaintiff's] protected expression.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (quoting *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009–10 (7th Cir. 2000)).

The Court will consider Plaintiff's reports of sex and disability discrimination together because she allegedly reported them to the same people at the same times. (*See* Dkt. Nos. 61 at 13, 75 at 15.) Plaintiff argues that the timing between her reports and termination is evidence of causation. (Dkt. No. 61 at 13.) Plaintiff has presented evidence that she reported disability

discrimination to Curto in December 2017 and disability and sex discrimination to Palacio in January 2018. (*See* Dkt. No. 75 at 15.) Brown identified Plaintiff for "realignment" on January 31, 2018, Brown rated Plaintiff in comparison with the three other TBMs in late February 2018, and Brown selected Plaintiff for termination in March 2018. (Dkt. Nos. 19 at 2; 64 at 44, 65, and 77–80.) Thus, Defendant selected Plaintiff for termination barely a month after her initial report and finalized the decision just weeks later. (*See id.*) This proximity in timing is sufficient to show causation. *See Yartzoff*, 809 F.2d at 1376. Thus, Plaintiff has put forth sufficient evidence for a jury to find that her reports of disability or sex discrimination were the but-for cause of her termination. *See Hodges*, 727 F.App'x at 238; *T.B. ex rel. Brenneise*, 806 F.3d at 473; *Francom*, 991 P.2d at 1191; *Allison v. Housing Auth.*, 821 P.2d 34, 38 (Wash. 1991).

Defendant has produced an explanation for why Plaintiff was terminated: the nationwide reduction in force. *See supra* Section II.C. Given the very close timing between Plaintiff's January 25, 2018 report to Palacio and Defendant's identification of Plaintiff for "realignment" on January 31, 2018, Plaintiff has shown sufficient evidence of pretext. *See Villiarimo*, 281 F.3d at 1065. Thus, questions of fact remain as to whether Plaintiff's reports were the cause of or a substantial factor in Defendant's decision to terminate Plaintiff. *See Hodges*, 727 F.App'x at 238; *T.B. ex rel. Brenneise*, 806 F.3d at 473; *Francom*, 991 P.2d at 1191. Therefore, Defendant's motion is DENIED as to Plaintiff's ADA, Title VII, and WLAD retaliation claims.

### F. Retaliation for FCA Reporting

To make out a *prima facie* retaliation claim under 31 U.S.C. § 3730(h), Plaintiff must prove three elements: "(1) that [she] engaged in activity protected under the statute; (2) that [Defendant] knew that [she] engaged in protected activity; and (3) that [Defendant] discriminated against [her] because she engaged in protected activity." *Moore v. California Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002). If Defendant produces a legitimate, non-retaliatory reason for Plaintiff's termination, the burden shifts to Plaintiff to show that the proffered explanation was pretextual. *See U.S. ex rel. Berglund v. Boeing Co.*, 835 F. Supp. 2d

1020, 1040 (D. Or. 2011).[5]

    1.    <u>Protected Activity</u>

To prove she was engaged in protected activity, Plaintiff must show she was "investigating matters which are calculated, or reasonably could lead, to a viable [FCA] action." *Moore*, 275 F.3d at 845. An FCA retaliation claim contains both an objective and subjective element: (1) whether Plaintiff in good faith believed and (2) whether "a reasonable employee in the same or similar circumstances might believe [that Defendant was] possibly committing fraud against the government." *Id.* at 845–46. Plaintiff need not refute Defendant's assertion that there was no FCA violation. *See Moore,* 275 F.3d at 845. But it is a "fatal defect" if a reasonable employee in the same circumstances could not conclude there was a false claim. *See Anton*, 91 F.3d at 1267.

Plaintiff moves for a finding that she engaged in protected activity as a matter of law when she reported her concerns about an off-label Zinbryta sale to Defendant. (Dkt. No. 48 at 11–13.) First, Plaintiff must show that she had a good faith belief that a false claim was possibly being made. *See Moore*, 275 F.3d at 845–46. Plaintiff knew in September 2017 that Lykins intended to deliver a Zinbryta START form to a doctor in connection with an off-label prescription. (*See* Dkt. No. 49 at 91.) Plaintiff knew Defendant's Zinbryta START forms were pre-filled for multiple sclerosis patients. (Dkt. No. 62 at 3.) Because the pre-filled form would falsely represent that the prescription was for on-label use to treat multiple sclerosis, Plaintiff was concerned that Lykins and the doctor were discussing Medicare fraud. (*Id.*) Thus, Plaintiff has shown that she believed in good faith that Lykins might be engaged in an FCA violation. *See*

---

[5] Although the "Ninth Circuit has not expressly determined whether the burden-shifting analysis utilized by the courts in analyzing claims under Title VII of the Civil Rights Act also applies to whistleblowing claims under the FCA," other circuit courts have concluded that an employer may product a legitimate reason for termination as an affirmative defense to an FCA claim. *See U.S. ex rel. Berglund v. Boeing Co.*, 835 F. Supp. 2d 1020, 1040 (D. Or. 2011) (collecting cases); *see also Moore*, 275 F.3d at 848 (applying Title VII retaliation analysis to one element of plaintiff's FCA claim).

*Moore*, 275 F.3d at 845–46.

Second, Plaintiff must show is that "a reasonable employee in the same or similar circumstances might believe [that Defendant was] possibly committing fraud against the government." *See id*. Plaintiff knew that Lykins was assisting the doctor in enrolling the patient for Zinbryta therapy. (*See* Dkt. No. 49 at 91.) Lykins's job, like Plaintiff's, was to promote and sell Defendant's products. (*See* Dkt. No. 53 at 1.) Thus, it was reasonable for Plaintiff to suspect that Lykins had assisted or encouraged the doctor to submit a prefilled form with a multiple sclerosis diagnosis for a Medicare patient without multiple sclerosis. A reasonable employee in Plaintiff's position could believe that a pharmaceutical sales representative who assists or encourages a doctor to submit such a form violates the FCA by causing "a false record or statement material to a false or fraudulent [Medicare claim] to be presented." *See* 31 U.S.C. § 3729(a)(1). Therefore, Plaintiff has shown that it was reasonable to suspect that Lykins's involvement in the off-label Zinbryta prescription was fraudulent. *Moore*, 275 F.3d at 845–46.

Third, the FCA requires that Plaintiff show she reported her concerns about the Zinbryta prescription. *See id*. She spoke to Lykins about the prescription and expressed concern about his involvement in September 2017. (Dkt. No. 49 at 91.) After Lykins continued his involvement, Defendant expressed her concern to Brown in November 2017. (Dkt. No. 51 at 102.) Plaintiff submitted an ethics complaint to Defendant's ethics hotline reporting the Zinbryta issue. (*Id.*) She spoke to Curto about her complaint in December 2017. (Dkt. No. 75 at 16–17.) And Plaintiff spoke to Palacio about her complaint in January 2018. (*Id.*) Thus, Plaintiff engaged in protected activity under the FCA when she reported and opposed the Zinbryta sale to Defendant. *See Moore*, 275 F.3d at 845. Therefore, Plaintiff's motion for a finding that she engaged in protected activity is GRANTED on this ground.

### 2. Defendant's Awareness of Plaintiff's Protected Activity

The second element of Plaintiff's *prima facie* case is whether Defendant knew of Plaintiff's protected activity. *See id*. Plaintiff reported her concerns about the Zinbryta sale to

Brown, the ethics hotline, Curto, and Palacio. (Dkt. Nos. 51 at 102, 75 at 16–17.) Plaintiff's communication to the ethics hotline, as well as two supervisors, a human resources partner, and in-house counsel, were sufficient to make Defendant aware of Plaintiff's protected activity.

### 3. Causation

The third element of Plaintiff's case is causation: she must show that Defendant selected her for termination because of her reported activity. *See Moore*, 275 F.3d at 845. Timing is circumstantial evidence of causation. *Yartzoff*, 809 F.2d at 1376. As discussed above, all three people involved in selecting Plaintiff for termination—Brown, Allison, and Palacio—were aware that Plaintiff had opposed Lykins's involvement in the Zinbryta sale. (Dkt. Nos. 19 at 2, 64 at 27.) Brown identified Plaintiff for termination as early as January 31, 2018, rated her as the lowest-performing TBM in February 2018, and finalized the decision to terminate Plaintiff in March 2018. (Dkt. Nos. 19 at 2, 64 at 77–80, 66 at 42–45.) Thus, Plaintiff has shown that Defendant selected her for termination less than two months after she engaged in protected activity. Less than two months between Plaintiff's protected activity and termination is close enough in time to support an inference of causation. *See Yartzoff*, 809 F.2d at 1376. Therefore, Plaintiff has established the third element of her *prima facie* case. *See Moore*, 275 F.3d at 845.

### 4. Pretext

Defendant states that Brown selected Plaintiff for termination not out of retaliatory animus but instead because of Defendant's nationwide reduction in force. (*See* Dkt. No. 50 at 9.) As discussed above, Defendant's explanation is a legitimate, non-retaliatory explanation for the termination. *See supra* Section II.C. Therefore, the burden is on Plaintiff to show this explanation is pretextual. *See Garrett*, 10 F.3d at 1431.

Brown was aware of Plaintiff's opposition to the Zinbryta sale in November 2017, and she participated in Curto's investigation into Plaintiff's December 2017 ethics complaint. (Dkt. Nos. 51 at 102, 64 at 72–73.) Thus, the primary person responsible for Plaintiff's termination was aware of Plaintiff's active, repeated opposition to the Zinbryta sale. Furthermore, in

Plaintiff's ethics complaint in early December 2017, she stated that she feared Brown would retaliate against her. (Dkt. No. 75 at 16.) Together, this is sufficient to show a material question of fact as to whether Plaintiff was terminated in retaliation for her FCA reports. *See Moore*, 275 F.3d at 845–46. Therefore, Defendant's motion for summary judgment is DENIED on this ground.

### G.    Wrongful Discharge

"The tort for wrongful discharge in violation of public policy is a narrow exception to the at-will doctrine." *Becker v. Cmty. Health Sys., Inc.*, 359 P.3d 746, 749 (Wash. 2015). Plaintiff must demonstrate that her discharge "contravenes a clear mandate of public policy." *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1089 (Wash. 1984). The Washington Supreme Court has stated that "courts should proceed cautiously if called upon to declare public policy." *Id.* at 1089. A whistleblower who reports conduct that clearly violates the letter or policy of a statute may be protected. *Dicomes v. State*, 782 P.2d 1002, 1009 (Wash. 1989).

In her complaint, Plaintiff bases her wrongful discharge claim on her allegation that she was discharged for whistleblowing, allegedly in violation of the policy underlying the CPA. (*See* Dkt. No. 1 at 18.) In her response to Defendant's motion for summary judgment, she additionally argues that her claim is supported by the policy underlying Washington's statute prohibiting Medicaid fraud, Wash. Rev. Code § 74.66. (*See* Dkt. No. 61 at 25.) As discussed above, questions of fact remain as to whether Plaintiff was terminated for whistleblowing activities. *See supra* Section II.F. Therefore, Defendant's motion for summary judgment is DENIED as to this claim.

### H.    Affirmative Defenses

Plaintiff moves for summary judgment on two of Defendant's affirmative defenses. (*See* Dkt. No. 48 at 14–19.) "Affirmative defenses plead matters extraneous to the plaintiff's *prima facie* case, which deny plaintiff's right to recover, even if the allegations of the complaint are true." *United States v. Ctr. for Diagnostic Imaging, Inc.*, Case No. C05-0058-RSL, Dkt. No 172

at 3 (W.D. Wash. 2011) (*quoting Fed. Deposit Ins. Corp. v. Main Hurdman*, 655 F.Supp. 259, 262 (E.D .Cal. 1987)). The Court considers whether the affirmative defenses are amenable to judgment as a matter of law for lack of a genuine issue of material fact. Fed. R. Civ. P. 56(c); *Quinn v. Everett Safe & Lock, Inc.*, Case No. C13-0005-JCC, Dkt. No. 48 at 13 (W.D. Wash. 2014).

### 1. Failure to Mitigate

Defendant asserts an affirmative defense based on Plaintiff's alleged failure to mitigate her economic and non-economic damages. (Dkt. Nos. 7 at 13, 67 at 11–15.) A plaintiff who has allegedly been wrongfully terminated has a duty to "use reasonable diligence in finding other suitable employment." *See Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995). A suitable position is one that is "substantially equivalent" to Plaintiff's previous job. *Ford Motor Co. v. E. E. O. C.*, 458 U.S. 219, 232 (1982). At trial, Defendant would carry the burden to prove failure to mitigate damages. *Id.* Conversely, to support her summary judgment motion to dismiss this affirmative defense, Plaintiff has the burden to show that no reasonable jury could find: "(1) that the damage suffered by [Plaintiff] could have been avoided, *i.e.*, that there were suitable positions available which [Plaintiff] could have discovered and for which he was qualified; and (2) that [Plaintiff] failed to use reasonable care and diligence in seeking such a position." *See Odima*, 53 F.3d at 1497.

Plaintiff has remained unemployed since she was terminated in 2018, despite having submitted applications or resumes to 30 companies. (*See* Dkt. No. 49 at 108–112.) Plaintiff contends that Defendant not offered evidence of suitable positions for which Plaintiff was qualified. (Dkt. No. 48 at 15.) In response, Defendant points to vocational rehabilitation expert William Skilling's report. (Dkt. No. 67 at 13.) In Skilling's assessment, Plaintiff's background, qualifications, and skills qualify her for positions as a sales representative in wholesale and manufacturing, technical, and scientific products. (Dkt. No. 70 at 6.) It is his opinion that Plaintiff has highly transferrable skills and she has unreasonably limited her search to

pharmaceutical and biotechnology companies. (Dkt. No. 68-5 at 42–43.)

As evidence of suitable positions, Skilling offers nationally compiled statistics of annual openings in the field of "sales representatives of technical and scientific products." (*Id.* at 9.) Skilling also ran a search on June 2, 2019, on Indeed.com for the keywords "pharmaceutical sales." (*Id.* at 10–13.) The search yielded 250 results for full-time postings at various pharmaceutical companies. *Id.* Skilling admits that he did not review the postings to determine whether they actually were pharmaceutical sales representative positions, and he offers little further description of the results. (*See* Dkt. No. 74 at 119.) Both the national statistics and Skilling's Indeed.com results fail to narrow their data beyond the broad category of "sales representative" to positions that are "substantially equivalent" to Plaintiff's previous job. *See Ford Motor Co.*, 458 U.S. at 232. Thus, Defendant has not presented sufficient evidence to support a conclusion that there were *suitable* positions available for an applicant with Plaintiff's transferable skills and years of experience. *See id.*

Defendant also argues that Plaintiff has failed to take enough steps to mitigate her adjustment disorder, mixed anxiety, and depression that Plaintiff alleges were caused by her termination. (Dkt. No. 67 at 14–15.) In support of this argument, Defendant contends that Plaintiff has failed to exercise enough, do yoga, and see a mental health specialist, and these choices amount to a failure to mitigate her mental health issues. (*Id.*) Plaintiff has offered evidence that she exercises regularly, meditates, and takes prescription medications to manage the symptoms of her mental health issues. (Dkt. No. 75 at 11.) The Court declines Defendant's invitation to prescribe a specific exercise or mental health regimen as part of Plaintiff's duty to mitigate noneconomic damages. Therefore, Plaintiff's motion is GRANTED on these grounds.

2.      Overriding Justification

Defendant asserts as an affirmative defense that it had overriding justifications for terminating Plaintiff's employment. (Dkt. No. 7 at 13.) Defendant acknowledges that overriding justification is only an affirmative defense to Plaintiff's claim of wrongful discharge in violation

of public policy. (*See* Dkt. No. 67 at 15.) Washington has four recognized categories of wrongful discharge in violation of public policy, one of which is discharge for reporting employer misconduct, *i.e.*, whistleblowing. *Martin v. Gonzaga Univ.*, 425 P.3d 837, 843 (Wash. 2018). Overriding justification is an affirmative defense that "should not be applied to a claim that falls within one of the four categories of wrongful discharge." *Id.* Plaintiff's wrongful discharge claim falls into the fourth category, whistleblowing. (*See* Dkt. No. 1 at 17–18); *Martin*, 425 P.3d at 843. Therefore, Plaintiff's motion to dismiss Defendant's affirmative defense of overriding justification is GRANTED on this ground.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment (Dkt. No. 48) is GRANTED in part and DENIED in part as follows:

1. Plaintiff's request for a determination that she is disabled as a matter of law within the meaning of the ADA and WLAD is DENIED.

2. Plaintiff's request for a determination that she engaged in protected activity as a matter of law by reporting sex discrimination under Title VII and the WLAD is GRANTED. Plaintiff's request for a determination that she engaged in protected activity under the FCA is GRANTED. Plaintiff's motion for a determination that she engaged in protected activity as a matter of law by reporting disability discrimination under the ADA and the WLAD is DENIED.

3. Plaintiff's request to dismiss Defendant's first affirmative defense of failure to mitigate and second affirmative defense of overriding justification is GRANTED.

Defendant's motion for summary judgment (Dkt. No. 50) is DENIED.

//

//

//

//

DATED this 16th day of October 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE